# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

NSK INDUSTRIES, INC.,                )       CASE NO. 5:22-cv-2335
                                     )
            PLAINTIFF,               )       JUDGE SARA LIOI
                                     )
vs.                                  )
                                     )       MEMORANDUM OPINION
                                     )       AND ORDER
TEKMART INTEGRATED                   )
MANUFACTURING SERVICES               )
LIMITED,                             )
                                     )
            DEFENDANT AND            )
            THIRD-PARTY              )
            PLAINTIFF,               )
                                     )
vs.                                  )
                                     )
                                     )
DOMETIC CORPORATION,                 )
                                     )
            THIRD-PARTY              )
            DEFENDANT.               )

Before the Court is the motion of third-party defendant Dometic Corporation ("Dometic") to dismiss (Doc. No. 35 (Motion to Dismiss)) third-party plaintiff Tekmart Integrated Manufacturing Services Limited's ("TIMS") third-party complaint (Doc. No. 24 (Third-Party Complaint ["TPC"])) for failure to state a claim. Dometic has also filed a motion to join Tekmart Integrated Manufacturing Systems, S. de R.L. de C.V. ("TIMS-Mexico") in the TPC as a required party or, alternatively, to dismiss the TPC for failure to join an indispensable party. (Doc. No. 36 (Motion for Compulsory Joinder).) TIMS filed a response to the motion to dismiss (Doc. No. 42 (Response to Motion to Dismiss)). TIMS and TIMS-Mexico filed a response to the motion for compulsory joinder (Doc. No. 43 (Response to Motion for Compulsory Joinder)). Dometic filed

replies in support of the motion to dismiss (Doc. No. 46 (Reply in Support of Motion to Dismiss))
and the motion for compulsory joinder. (Doc. No. 47 (Reply in Support of Motion for Compulsory
Joinder).) For the reasons that follow, Dometic's motion to dismiss is granted in part and denied
in part, and its motion for compulsory joinder is denied.

## I.      BACKGROUND

Unless otherwise noted, all facts are taken from the TPC and are viewed in the light most
favorable to TIMS as the non-moving party. TIMS is "in the business of manufacturing and
assembling products for companies as an essential link in their supply chains." (Doc. No. 24 ¶ 5.)
As is pertinent to the pending motions, the TPC describes the origins of its supply chain
relationship with Dometic as follows:

> In about July 2019, TIMS entered into a business relationship with Dometic to
> produce a type of toilet, specifically a Model 300 Toilet (the "Product"), at a facility
> in Juarez, Mexico, leased and staffed by TIMS's Mexican subsidiary ("TIMS[-
> ]Mexico"). TIMS owned the equipment and inventory at the Juarez facility and was
> at all times responsible for accounts for purchasing and ordering, while TIMS[-
> ]Mexico handled the manufacturing and assembly process on-site. As is common
> among supply-chain arrangements like those handled by TIMS, there was no
> overarching written contract with its customer, i.e., Dometic, to fix the processes
> by which TIMS or TIMS[-]Mexico manufactured components for the Product,
> ordered other components specified by Dometic from suppliers selected by
> Dometic (the "Directed Suppliers"), and finally assembled the Product in Juarez.
> Rather, TIMS and/or TIMS[-]Mexico and Dometic regularly corresponded with
> one another to consult regarding Dometic's ongoing demand for the Product, with
> their communications and conduct establishing the metes and bounds of their
> contractual responsibilities.

(*Id*. ¶ 6.)

For approximately the first two years of Dometic and TIMS's business relationship,
Dometic gave TIMS "annual, full-year forecasts for [its] purchase" of the toilets in question, as
well as purchase orders covering its orders for six to nine months. (*Id*. ¶ 7.) Based on these forecasts
and purchase orders, TIMS developed plans for manufacturing certain components of the toilets

2

at the Juarez, Mexico facility. (*Id.*) Among those components were two halves of the toilet bowl called the "Outer Bowl" and the "Bowl Rim." (*Id.*) Because TIMS did not produce all components of the Model 300 Toilet, Dometic specified "Directed Suppliers" to manufacture those components. (*Id.* ¶ 8.) TIMS used Dometic's forecasts and purchase orders to plan purchases of components from Directed Suppliers. (*Id.*) One of those Directed Suppliers was plaintiff NSK Industries, Inc ("NSK"). (*Id.*) NSK manufactured several components of the Model 300 Toilet, including a "Quad O-Ring," which is a rubber seal that fits between the Outer Bowl and the Bowl Rim to stop leakage and odor. (*Id.*)

According to the TPC, "Dometic treated its annual forecasts as firm orders." (*Id.* ¶ 9.) Purchase orders would be issued based on these forecasts and were designed "to meet forecast demands for shipments of the Product on a weekly basis." (*Id.*) Further, Dometic controlled the ordering and purchasing process in a number of ways, including by reissuing certain purchase orders to satisfy "unmet demand" that resulted when TIMS's production capacity was limited by "component constraints" experienced by the Directed Suppliers. (*Id.* ¶ 10.) Accordingly, while the forecasts were treated as firm, the purchase orders were "treated as flexible, intended to represent and be updated to represent current demand, as provided in forecasts or express directions by Dometic" in communications to TIMS and TIMS-Mexico. (*Id.* ¶ 11.)

During the assembly process, TIMS-Mexico would assemble the products "according to a process required by Dometic." (*Id.* ¶ 12.) Dometic provided TIMS and TIMS-Mexico with personnel training and instruction on assembly. (*Id.*) Dometic also required TIMS to conduct specific testing during the process of assembling the toilets, called the "Line Test," to verify that the toilets were assembled according to Dometic's standards for a functioning toilet. (*Id.* ¶ 13.)

TIMS alleges that, in May 2021, Dometic changed its ordering procedures from issuing

3

full-year forecasts and long-term purchase orders to issuing purchase orders on a monthly basis. (*Id.* ¶ 15.) In August 2021, Dometic informed TIMS that it must adapt its purchase orders to the Directed Suppliers to include a six-month outlook, thus requiring TIMS to maintain extensive open orders of components from the Directed Suppliers at all times. (*Id.* ¶ 16.) In February 2022, Dometic shifted gears again and sent TIMS a full-year forecast covering the period of January 2022 through January 2023. (*Id.* ¶ 17.) As it had in the past, TIMS used this forecast to place purchase orders of component parts from the Directed Suppliers. (*Id.*) Around the same time, Dometic informed TIMS that it should be prepared to meet requirements of at least 3,456 assembled toilets per week and 13,524 assembled toilets per month. (*Id.* ¶ 18.) Dometic increased its demand accordingly through the first half of 2022. (*Id.* ¶ 19.)

On August 3, 2022, Dometic "turned on a dime" and canceled all orders from TIMS through December 2022, reasoning that there had been a sudden drop in demand for the toilets. (*Id.* ¶¶ 21–22.) One week later, Dometic sent TIMS a report claiming that there was a defect in the toilets TIMS had produced. (*Id.* ¶¶ 29–30.) Despite the fact that TIMS's products passed the Line Test, Dometic purportedly discovered this defect by subjecting TIMS's products to the "Flood Test" and the "Front End Load Test." (*Id.* ¶¶ 30–31.) According to the TPC, Dometic had never required TIMS to perform either test. (*Id.* ¶ 30.) Moreover, TIMS alleges that the purported defect was statistically insignificant, representing, at most, only 0.1% of customer warranty claims. (*See id.* ¶ 48.) Nevertheless, Dometic advised TIMS that "[p]roduction needs to be stopped until further notification" and it would "not be sending any [purchase orders for products] until the quality hold has been released." (*Id.* ¶¶ 32–33.)

Despite the fact that TIMS continued to work with Dometic in good faith over the ensuing months to resolve the purported defect, TIMS alleges that Dometic strung TIMS along, presumably

while it pursued an alternative supplier, until it eventually ended its relationship with TIMS. (*See id.* ¶ 67; *see generally id.* ¶¶ 34–77.) As a result of Dometic's cancellations of orders and refusal to accept already-assembled products, TIMS was required to sever its relationships with its Direct Supplies, including NSK, from whom it had ordered component parts. (*Id.* ¶ 124; *see id.* ¶ 8.)

This case commenced when NSK filed a complaint in state court against TIMS for breach of contract, among other allegations, based on the losses it sustained when TIMS canceled its purchase orders for the component parts. (*See generally* Doc. No. 1-2 (Complaint).) The action was removed to federal court on the basis of diversity jurisdiction. (*See* Doc. No. 1 (Notice of Removal), at 1–2.[1]) TIMS filed a third-party complaint against Dometic claiming that Dometic is liable for the damages asserted against TIMS in NSK's complaint. (Doc. No. 24.) Dometic then filed an answer to the TPC and asserted counterclaims against TIMS and TIMS-Mexico. (Doc. No. 37.) Dometic later voluntarily dismissed its claims against TIMS-Mexico. (*See* Doc. No. 49.)

TIMS raises the following third-party claims against Dometic: breach of contract (Cause of Action A), promissory estoppel (Cause of Action B), quantum meruit and unjust enrichment (Cause of Action C), fraudulent misrepresentation (Cause of Action D), negligent misrepresentation (Cause of Action E), and tortious interference with business relationships (Cause of Action F). (*See generally* Doc. No. 24.) Dometic moves for the dismissal of all the claims in the TPC, with the exception of TIMS's contract claim (Cause of Action A). (Doc. No. 35, at 1.) Dometic argues that TIMS's quasi-contract claims—promissory estoppel (Cause of Action B) and quantum meruit and unjust enrichment (Cause of Action C)—cannot be asserted alongside its contract claim. Dometic also maintains that the tort claims (Causes of Action D, E,

---

[1] All page number references herein are to the consecutive page numbers applied to each individual document by the Court's electronic docketing system.

and F) have various pleading deficiencies that necessitate dismissal.

In its motion for joinder, Dometic seeks involuntary joinder of TIMS-Mexico as a third-party plaintiff. Should the Court determine that joinder is not possible, Dometic alternatively requests that the TPC be dismissed for failure to join a necessary party.

## II.    MOTION TO DISMISS

### A.  Standard of Review

A motion to dismiss under Fed. R. Civ. P. 12(b)(6) challenges the sufficiency of the complaint tested against the notice pleading requirements of Fed. R. Civ. P. 8(a)(2), which provides that a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief[.]" Although this standard is liberal, Rule 8 still requires a complaint to provide the defendant with "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007). Thus, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true," to state a plausible claim. *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009) (quoting *Twombly*, 550 U.S. at 570); *see also Ryan v. Blackwell*, 979 F.3d 519, 524 (6th Cir. 2020) (quoting *Rudd v. City of Norton Shores*, 977 F.3d 503, 511 (6th Cir. 2020)) ("When determining whether [plaintiff's] complaint meets this standard 'we accept as true its factual allegations and draw all reasonable inferences in his favor, but we disregard any legal conclusions.'") (further citation omitted).

A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556). Plausibility "is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* "[W]here

the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Id.* at 679, (quoting Fed. R. Civ. P. 8(a)(2) (second alteration in original)). In such a case, the plaintiff has not "nudged [its] claims across the line from conceivable to plausible, [and the] complaint must be dismissed." *Twombly*, 550 U.S. at 570. "The plausibility of an inference depends on a host of considerations, including common sense . . . ." *Ryan*, 979 F.3d at 524 (quoting *16630 Southfield Ltd. P'ship v. Flagstar Bank, F.S.B.*, 727 F.3d 502, 504 (6th Cir. 2013) (citing *Iqbal*, 556 U.S. at 678)).

While a complaint need not set down in detail all the particulars of a plaintiff's claim, "Rule 8 . . . does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Iqbal*, 556 U.S. at 678–79 (stating that this standard requires "more than an unadorned, the-defendant-unlawfully-harmed-me accusation"). That said, "[t]he pleading standard is generally construed quite liberally." *Ryan*, 979 F.3d at 524 (citing *Sam Han v. Univ. of Dayton*, 541 F. App'x 622, 625 (6th Cir. 2013)). But "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555).

### B.  Shotgun Pleading

As an initial matter, Dometic complains that the TPC improperly "utilizes cascading incorporation by reference paragraphs" whereby it sets forth ninety-two paragraphs of general facts, followed by a series of causes of action that incorporate by reference all preceding paragraphs contained in the pleading into each subsequent count. (Doc. No. 35, at 3.) Dometic seems to contend, without explicitly stating, that this constitutes a "shotgun pleading." A "shotgun pleading" occurs "when it is virtually impossible for a defendant to know which allegations of fact

are intended to support which claims for relief" or "when a complaint fails to separate each cause of action or claim for relief into separate counts." *King v. G4S Secure Solutions (USA) Inc.*, No. 1:18-cv-448, 2019 WL 858672, at *4 (N.D. Ohio 2019) (internal quotations omitted); *Lee v. Ohio Educ. Ass'n*, 951 F.3d 386, 392–93 (6th Cir. 2020).

Contrary to Dometic's assertions, the TPC does not constitute an impermissible "shotgun pleading." In *Lee*, the Sixth Circuit affirmed the district court's dismissal of the complaint in part because the plaintiff pleaded seven different causes of action in one sentence. 951 F.3d at 393. Unlike the complaint in *Lee*, the TPC clearly separates its causes of action into separate counts. *See id.* at 392; (Doc. No. 24 ¶¶ 93–125). Moreover, courts have found that pleadings are sufficient, under Fed. R. Civ. P. 8, if a "brief reading" permits "the reader to determine which allegations of fact support the asserted claims for relief and it is possible to determine which causes of action are asserted against each defendant[.]" *King*, 2019 WL 858672, at *4. Here, as will be evident from the Court's discussion of the various claims, a brief reading of the TPC permits the reader to discern which allegations in the facts section support each cause of action. *See, e.g.*, *Darwish v. Ethicon*, No. 1:20-cv-1606, 2020 WL 7129582, at *10 (N.D. Ohio Dec. 4, 2020) (holding that a complaint did not constitute a "shotgun pleading" because "[if]t [was] clear upon reading the [c]omplaint which factual allegations [were] intended to support which claims for relief"). To the extent Dometic seeks dismissal of the Causes of Action B—F on the basis of "shotgun pleading," its motion is denied.

### C.  Alternative Pleading of Quasi Contract Claims

In addition to a breach of contract claim (Cause of Action A), TIMS asserts quasi-contractual claims of promissory estoppel (Cause of Action B) and unjust enrichment and/or quantum meruit (Cause of Action C). (*See* Doc. No. 24 ¶¶ 103–13.) *See Hoffman v. David*, No.

CA2006-09-076, 2007 WL 2229569, at *1 (Ohio Ct. App. Aug. 6, 2007) (explaining that promissory estoppel is a "quasi-contractual concept where a court in equity seeks to prevent injustice by effectively creating a contract where none existed"); *Wuliger v. Mfrs. Life Ins. Co. (USA)*, 567 F.3d 787, 799 (6th Cir. 2009) (quoting *Beatley v. Beatley*, 828 N.E.2d 180, 192–93 (Ohio 2005)) (describing unjust enrichment as "an equitable doctrine to justify a quasi-contractual remedy that operates in the absence of an express contract or a contract implied in fact to prevent a party from retaining money or benefits that in justice and equity belong to another").

Dometic seeks to dismiss TIMS's quasi-contractual claims on the grounds that "there is no dispute that TIMS and Dometic had some contract governing the business at issue[.]" (Doc. No. 35, at 4.) "In Ohio, where the parties have an enforceable contract and merely dispute its terms, scope, or effect, one party cannot recover for [quasi-contractual claims]." *O'Neill v. Kemper Ins. Cos.*, 497 F.3d 578, 583 (6th Cir. 2007) (citations omitted). Citing first to the paragraph in the TPC discussing the origins of the parties' relationship and averring that TIMS "entered into a business relationship with Dometic to produce a type of toilet" (*see* Doc. No. 24 ¶ 6), Dometic then turns to its answer, noting that it specifically "admits it issued purchase orders to TIMS[]." (Doc. No. 37 (Answer to TPC) ¶ 6; Doc. No. 35, at 3–4.) Because it concedes the existence of purchase orders—which Dometic insists represent the sum and substance of the parties' contractual arrangement—Dometic argues that TIMS is precluded from pleading quasi-contractual claims in the alternative. (Doc. No. 35, at 4.)

TIMS, on the other hand, posits that Dometic has intentionally misrepresented the nature of the parties' contract, as well as TIMS's breach of contract claim, by selectively quoting the TPC and then impermissibly relying on its own answer to define the contract contemplated in the TPC. (Doc. No. 42, at 6.) It notes that the remainder of paragraph 6 of the TPC makes clear that the

9

parties had "no overarching written contract[,]" as is common in the industry, but that the parties regularly communicated regarding "Dometic's ongoing [product] demand . . . with their communications and conduct establishing the metes and bounds of their contractual responsibilities." (*Id*. at 6–7 (citing Doc. No. 24 ¶ 6).) According to TIMS, the TPC then sets forth a series of factual allegations—including allegations involving the annual forecasts and other production demands that Dometic made over the course of the parties' relationship—that define "Dometic's liability in contract for its breach of obligations to pay for products and component parts pursuant to its own expressions outside of a particular written instrument." (*Id*. at 6–8.) It concludes that Dometic "purposefully confuses the issue: it is not the purchase orders but the umbrella contract claim that, if proven at trial, would render the promissory estoppel claim moot or void." (*Id*. at 10.)

A review of the TPC supports TIMS's position. The factual allegations in the TPC point to the annual forecasts, which the TPC describes as "firm[,]"[2] and the production demands made by Dometic as undergirding the parties' contractual obligations. (Doc. No. 24 ¶¶ 6–11, 15–19.) It is well settled that a party's claims are defined by the factual allegations contained in the complaint and not a defendant's answer. *See generally Caterpillar Inc. v. Williams*, 482 U.S. 386, 398–99, 107 S. Ct. 2425, 96 L. Ed. 2d 318 (1987) (noting that the plaintiff is the master of his complaint). Regardless of whether TIMS will ultimately prevail on its contract claim, it is clear that the TPC pleads the existence of a contract that exceeds the purchase orders Dometic acknowledges.

Consequently, the Court must conclude that the parties do not agree on the existence of a contract that governs their relationship. It is not that the parties simply disagree as to the terms of

---

[2] In contrast to the annual forecasts, the TPC referred to the purchase orders, which Dometic insists provide the only foundation for the parties' contractual arrangement, as "flexible." (*Id*. ¶ 11.)

any particular agreement; they disagree as to the very source of the parties' contractual rights, duties, and obligations. *See, e.g.*, *Oxbo, Inc. v. Konecranes Nuclear Equip. & Servs., LLC*, No. 3:22-cv-46, 2023 WL 1813641, at *4 (S.D. Ohio Feb. 7, 2023) (permitting alternately pled quasi-contract claims, noting "it is unclear to the Court, at this early stage in the proceedings, *what constitutes 'the contract.*'* Specifically, although each side attaches the Purchase Order as the contract entered into, it is unclear from the allegations in the Complaint and Counterclaim what, if any additional documents are to be included.") (emphasis added). In fact, Dometic's answer drives this point home. In it, Dometic "denies the allegations of paragraph 6 [of the TPC] *except it admits it issued purchase orders*" to TIMS and TIMS-Mexico "about production of the goods." (Doc. No. 37 ¶ 7 (emphasis added).) It has, therefore, denied the existence of any contract other than one crafted solely from the purchase orders.

In the absence of any agreement as to the existence of a contract that governs the parties' relationship, TIMS argues that it is free at this stage to plead quasi-contractual claims in the alternative. (*See* Doc. No. 42, at 4–5, 10.) Under Rule 8, "[a] party may state as many separate claims or defenses as it has, *regardless of consistency*." Fed. R. Civ. P. 8(d)(3) (emphasis added); *see Pearson v. FirstEnergy Corp. Pension Plan*, 76 F. Supp. 3d 669, 675–76 (N.D. Ohio 2014) (collecting cases). While Ohio law does not permit a party to recover damages under quasi-contractual theories when there exists an enforceable contract, *see Cook v. Home Depot U.S.A., Inc.*, No. 2:06-cv-571, 2007 WL 710220, at *8 (S.D. Ohio Mar. 6, 2007), it does "permit[,] that where there is a dispute as to the existence or enforceability of a contract, a party may plead promissory estoppel or unjust enrichment in the alternative." *Bonner Farms, Ltd. v. Power Gas Mktg. & Transmission, Inc.*, No. 5:04-cv-2188, 2007 WL 2463247, at *14 (N.D. Ohio Aug. 28, 2007). As a result, federal courts in Ohio have allowed quasi-contractual claims that were pled in

11

the alternative, like those in this case, to survive a motion to dismiss on the basis that such claims could succeed if the contract claim failed. *See, e.g., id.*; *Oxbo*, 2023 WL 1813641, at \*3–4; *Kendall v. Phoenix Home Health Care Servs. Ltd.*, No. 2:15-cv-3009, 2016 WL 5871506, at \*3 (S.D. Ohio Oct. 7, 2016); *Miami Valley Mobile Health Servs., Inc. v. ExamOne Worldwide, Inc.*, 852 F. Supp. 2d 925, 939–40 (S.D. Ohio 2012). Therefore, the Court finds that TIMS is not prohibited from pleading quasi-contract claims at this stage of the proceedings when it also alleges breach of contract. The Court denies Dometic's motion to the extent that it requests dismissal for this reason.

While Dometic does not challenge, in principle, the right of a party to plead claims alternatively, it argues that even if TIMS is permitted to plead quasi-contract claims alternatively, it has failed to do so properly. (Doc. No. 35, at 3.) Referencing TIMS's practice of incorporating by reference all preceding paragraphs, it argues that TIMS impermissibly "snowballed" all of the factual allegations, including the factual allegations that support the finding that the parties had an umbrella agreement, into the quasi-contract claims. (Doc. No. 35, at 3.) As previously discussed, TIMS's practice of incorporating by reference prior paragraphs did not violate Rule 8's pleading requirements. Moreover, the fact that the claims—or some of the factual allegations supporting the claims—are inconsistent, or even contrary, does not necessitate dismissal at the pleading stage. *See Ajuba Int'l, LLC v. Saharia*, 871 F. Supp. 2d 671, 688 (E.D. Mich. 2012) ("Under Rule 8, a pleading does not become insufficient by reason of a party having made alternative, or even contradictory, claims." (quotation marks and citations omitted)).

In its reply brief, Dometic argues for the first time that any contract that exceeds the afore-mentioned purchase orders would be barred by the statute of frauds. (Doc. No. 46, at 2.) It also points for the first time to certain provisions in the purchase orders that limit the parties' obligations

12

with respect to those documents. (*Id.* at 6 n.2 (citing Doc. No. 37, at 32–34).)[3] "[T]he Sixth Circuit repeatedly has recognized that arguments raised for the first time in a party's reply brief are waived." *Hunt v. Big Lots Stores, Inc.*, 244 F.R.D. 394, 397 (N.D. Ohio 2007) (quoting *Irwin Seating Co. v. Int'l Bus. Machines Corp.*, No. 1:04-cv-568, 2007 WL 518866, at *2 (W.D. Mich. Feb. 15, 2007) (collecting cases)); *see Dykes v. Marshall*, No. 1:14-cv-1167, 2016 WL 1059618, at *3 (W.D. Mich. Mar. 17, 2016) ("The Sixth Circuit's longstanding rule is that issues raised for the first time in a reply brief are considered waived."); *see also Sanborn v. Parker*, 629 F.3d 554, 579 (6th Cir. 2010) ("We have consistently held . . . that arguments made to us for the first time in a reply brief are waived."). The Court will not consider these arguments at this time but will permit Dometic to revisit these issues on summary judgment, at which time TIMS will have the opportunity to respond on a fully developed record.

For all of these reasons, the Court denies Dometic's motion to dismiss TIMS's quasi-contract and tort claims.

### D.  Individual Claims and Alleged Pleading Deficiencies

#### *1. Cause of Action B: Promissory Estoppel*

As previously discussed, in Cause of Action B, TIMS alleges that it reasonably relied on

---

[3] It is worth noting that Dometic did not produce the purchase orders, even though the Court could have considered them on a Rule 12(b)(6) motion without converting the motion into one for summary judgment, when they were referenced in the TPC and central to its claims. *See Bassett v. Nat'l Coll. Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008) (citation omitted). Instead, Dometic cited again from its *answer* wherein it quoted portions of the purchase orders. (*See* Doc. No. 46, at 6 n.2 (citing Doc. No. 37 ¶ 7).) Yet, even these selected provisions do not provide that the purchase orders represent the totality of the parties' contractual relationship, and without access to the entirety of the purchase orders, the Court cannot determine whether the parties' contractual relationship was confined to these documents. Likewise, at this stage, it is unclear whether the statute of frauds would bar the quasi-contract claims, as there are written instruments identified in the TPC that may have created contractual obligations apart from the purchase orders. (*See, e.g.*, Doc. No. 24 ¶¶ 7, 9, 15, 17.) Furthermore, the Court cannot determine at this stage of the proceedings whether one or more of the exceptions to the statute of frauds would apply. *See, e.g.*, Ohio Rev. Code § 1303.04(B) (discussing the merchant exception to the statute of frauds). These arguments must wait for summary judgment.

promises Dometic made that it would purchase the products and component parts and was injured as a result of its reliance.  (Doc. No. 24 ¶¶ 103–08.) Thus, in a claim sounding in promissory estoppel, TIMS contends that it is entitled to reliance or expectation damages. (*Id.* ¶ 108.)

A claim of promissory estoppel requires a finding that "[a] promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise." *McCroskey v. State*, 456 N.E.2d 1204, 1205 (Ohio 1983) (quoting Restatement (Second) of Contracts: § 90 (1973)). Promissory estoppel is a "quasi-contractual concept where a court in equity seeks to prevent injustice by effectively creating a contract where none existed." *Hoffman*, 2007 WL 2229569, at *1.

TIMS has pled sufficient facts to make it plausible that Dometic made promises to TIMS that it should have "reasonably expect[ed] to induce action or forbearance on the part of [TIMS]" and did "induce such action or forbearance[.]" *McCroskey*, 456 N.E.2d at 1205. TIMS alleges that after receiving an annual forecast from Dometic for January 2022 to January 2023 in February 2022, "[a]s TIMS had always done[,]" it "used the forecasts to place purchase orders from the Directed Suppliers for the future shipment of components." (Doc. No. 24 ¶ 17.) Then, in August 2022, Dometic canceled all future orders. (*Id.* ¶¶ 20–22.) On August 9, 2022, TIMS informed Dometic that it had incurred costs for "components ordered or partially assembled by TIMS in reliance upon Dometic's forecasts." (*Id.* ¶ 26.) Given that factual allegations support each of the elements, and would, if believed, support TIMS's right to relief, TIMS's promissory estoppel claim cannot be dismissed at this time.

### 2. Cause of Action C: Quantum Meruit and Unjust Enrichment

In Cause of Action C, TIMS asserts that "Dometic possesses [p]roducts that TIMS

assembled for Dometic's purchase" and that its "retention of the benefit [of these products] is unjust" because of its cancelation of future orders and refusal to "acknowledge the quality of" the products TIMS assembled. (Doc. No. 24 ¶ 109–13.) It thus makes claims sounding in quantum meruit and unjust enrichment. (*Id.*)

"The elements of an unjust enrichment claim are: (1) a benefit conferred by a plaintiff upon a defendant; (2) knowledge by the defendant of the benefit; and (3) retention of the benefit by the defendant under circumstances where it would be unjust to do so without payment." *Poston v. Shelby-Love*, 95 N.E.3d 659, 663 (Ohio Ct. App. 2017). A claim for unjust enrichment is an equitable claim and is based on a legal fiction where courts will imply a "contract" as a matter of law. *See Wuliger*, 567 F.3d at 799 (quoting *Beatley v. Beatley*, 828 N.E.2d 180, 192–93 (Ohio 2005)) ("Unjust enrichment is an equitable doctrine to justify a quasi-contractual remedy that operates in the absence of an express contract or a contract implied in fact to prevent a party from retaining money or benefits that in justice and equity belong to another." (emphasis omitted)); *see also Reisenfeld & Co. v. Network Group, Inc.*, 277 F.3d 856, 860 (6th Cir. 2002) ("A contract implied-in-law, or 'quasi-contract' is not a true contract, but instead a liability imposed by courts in order to prevent unjust enrichment.").

Reading the TPC in the light most favorable to TIMS, it is sufficiently plausible that the elements of an unjust enrichment claim are met in this case. According to the TPC, TIMS "conferred a benefit . . . upon [Dometic]" by assembling Model 300 Toilets and A/C Plastics, Dometic had "knowledge" of the benefit, Dometic is currently retaining the benefit (since TIMS's production activities "allow Dometic to sell products to its customers"), and, because the products were not actually defective, "retention of the benefit . . . would be unjust . . . without payment." (*See* Doc. No. 24 ¶ 109–13.) *See Poston*, 95 N.E.3d at 663 (providing the elements of an unjust

15

enrichment claim). Thus, dismissal of the quantum meruit claim at this early stage is inappropriate.

### 3.  Cause of Action D: Fraudulent Misrepresentation

TIMS alleges that Dometic intentionally made false statements and that TIMS justifiably relied on those statements to its detriment. (Doc. No. 24 ¶¶ 114–17.)

Under Ohio law, the elements of fraudulent misrepresentation are: "(1) a representation or, when there is a duty to disclose, a concealment of a fact; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity, or with such utter disregard as to whether it is true or false that knowledge may be inferred; (4) with the intent of misleading another into relying upon it; (5) justifiable reliance on the representation or concealment; and (6) an injury proximately caused by that reliance." *Stuckey v. Online Resources Corp.,* 819 F. Supp. 2d 673, 682 (S.D. Ohio 2011) (citing *Williams v. Aetna Fin. Co.*, 700 N.E.2d 859, 868 (Ohio 1998)).

Because claims of fraudulent misrepresentation involve as an element an intentionally false or fraudulently-made misrepresentation, such claims must meet the heightened pleading requirements of Fed. R. Civ. P. 9(b). Rule 9(b) provides, in part, that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." The Sixth Circuit has held that to comply with Rule 9(b), a pleader must "allege the time, place, and content of the alleged misrepresentation on which he or she relied; the fraudulent scheme; the fraudulent intent of the defendants; and the injury resulting from the fraud." *U.S. ex rel. Bledsoe v. Cmty. Health Sys., Inc.*, 501 F.3d 493, 504 (6th Cir. 2007) (quoting *U.S. ex rel. Bledsoe v. Cmty. Health Sys., Inc.*, 342 F.3d 634, 643 (6th Cir. 2003)). But despite the heightened pleading standard for fraud claims, "Rule 9(b) is not to be read in isolation, but is to be interpreted in conjunction with Federal Rule of Civil Procedure 8," which "requires only 'a short and plain statement of the claim' made by 'simple, concise, and direct allegations.'" *Id*. at 503 (quoting Fed. R. Civ. P. 8(a));

*see also U.S. ex rel. SNAPP, Inc. v. Ford Motor Company*, 532 F.3d 496, 504 (6th Cir. 2008) ("Rule 9(b) . . . should not be read to defeat the general policy of 'simplicity and flexibility' in pleadings contemplated by the Federal Rules." (citation omitted)).

TIM's alleges two fraudulent misrepresentations to support its claim. The first alleged misrepresentation is that Dometic falsely claimed "the [p]roducts [TIMS produced] had a quality issue that TIMS could have detected pursuant to those tests that Dometic identified to TIMS and required TIMS to use." (Doc. No. 24 ¶ 115.) The second is that Dometic falsely "gave assurance that it would issue a purchase order for the A/C Plastics and related component parts if TIMS first shipped it the production equipment associated with the A/C Plastics." (*Id.* ¶ 117.) According to TIMS, these two alleged misrepresentations are supported by facts alleged in the preceding paragraphs. (*See* Doc. No. 42, at 11.)

Regarding TIMS's first allegation of fraudulent misrepresentation (*see* Doc. No. 24 ¶¶ 115–16), TIMS avers that as early as "late June 2022[,]" Dometic's internal communications between its employees, including communications authored by its "Operations Manager," identified what Dometic considered an immaterial quality concern. (*Id.* ¶ 27; *see also id.* (noting that the Operations Manager's written communication stated that "[t]he percentage of sales v. warranty (all claims) is only about 0.1%"); *id.* ¶ 28 (noting that the Operations Manager indicated in the same communication that "[w]e will probably always see this defect because of the design of the bowl halves and the manner in which people use the toilet").) Nevertheless, on August 10, 2022, Dometic's Operations team sent TIMS what it described as a report (dated August 9, 2022) identifying the alleged defect. (*Id.* ¶ 29.) Dometic identified defects in a batch of TIMS's products by conducting the "Flood Test" and the "Front End Load Test" on the products, both of which TIMS alleges "had never been identified to TIMS, much less required of TIMS[.]" (*Id.* ¶ 30.) TIMS

17

also alleges that on September 8, 2022, Dometic sent TIMS a rejection letter for products that had been delivered to Dometic in which it "claimed that the Line Test, if properly used at TIMS Mexico's facility, would have detected the claimed leak responsible for the customer complaints, when the testing would not have done so[.]" (*Id.* ¶ 52.) In further support, TIMS explains that the products Dometic had "subjected to the Line Test and only the Line Test" all passed the test. (*Id.*) The products in which Dometic identified defects, however, had been subjected to other tests that had not been required of TIMS. (*Id.* ¶ 30.)

Thus, as required by Fed. R. Civ. P. 9(b), TIMS specified the fraudulent statement Dometic allegedly made (that the Line Test, if conducted properly, would have revealed the defects), stated when and where that statement was made (on September 8, 2022, in a letter), and explained why the statement was fraudulent (the products that were subjected to the Line Test only all passed the test).[4] While TIMS did not identify the speaker of the statement by name, it identified the letter in which the statement was made and indicated that the letter was from Dometic. (*See id.* ¶ 52.) "Under Rule 9(b), 'a complaint that identifies a particular corporate defendant as well as the 'time, place, and content of the alleged misrepresentation' need not also identify the corporation's individual employee who made the alleged fraudulent misrepresentation.'" *See Alsbrook v. Concorde Career Coll., Inc.*, 469 F. Supp. 3d 805, 843–44 (W.D. Tenn. 2020) (quoting *Newberry v. Serv. Experts Heating & Air Conditioning, LLC*, 806 F. App'x 348, 362 (6th Cir. 2020) (further quotation marks and citation omitted)); *see, e.g.*, *Peres v. Third Fed. Savings and Loan Ass'n of Cleveland*, No. 1:18-cv-18, 2019 WL 1318130, at *4 (S.D. Ohio March 22, 2019) (holding that plaintiffs satisfied the requirements of 9(b) when they identified Third Federal Savings and Loan

---

[4] As set forth above, the TPC identified with specificity other allegedly false statements, including the date and nature of those statements, leading up to the September 8, 2022 letter. (*See* Doc. No. 24 ¶¶ 27–30.)

Association as the author of fraudulent statements in a letter). Such a conclusion is especially appropriate given that no discovery has taken place and that the facts surrounding Dometic's internal communications, which TIMS alleges are at odds with the representations it made to TIMS regarding the existence of a defect, are within Dometic's control. *See Michaels Bldg. Co. v. Ameritrust Co., N.A.*, 848 F.2d 674, 679 (6th Cir. 1988) ("Especially in a case in which there has been no discovery, courts have been reluctant to dismiss the action where the facts underlying the claims are within the defendant's control.").

With respect to the second misrepresentation—Dometic's promise to issue purchase orders for the component parts if TIMS first shipped the plastics equipment—the TPC provides that in March 2022, Dometic made "verbal assurances" to TIMS "that it would issue a purchase order for the obsolete components and any finished A/C Plastics, [so] TIMS shipped the production equipment[.]" (Doc. No. 24 ¶ 85.) When Dometic failed to issue the promised purchase orders, TIMS sent repeated inquiries to Dometic, but Dometic did not respond. (*Id.* ¶ 86.) On April 6, 2022, "[a]n employee for Dometic,"[5] responded by email to TPC, "Give me [an] opportunity to work on this as well to give you feedback." (*Id.* ¶ 87.) On June 23, 2022, the Dometic employee finally responded:

> As you can imagine, Dometic will be responsible for material only if there is a justification for having the volumes. We will need to request approval to buy it, so we need to give the whole information to our upper management in order to pro[ve] the responsibility of Dometic.
>
> Even i[f] it is an email where Dometic provided the Forecast or the go ahead to buy the materials, that is what I am looking for.

(*Id.* ¶¶ 88–89 (alternation in original).) TIMS alleges that this response ignored the fact that the

---

[5] The TPC further provides that the author of the email was "a different person from [the individual with whom] TIMS had been previously communicating[.]" (*Id.* ¶ 87.)

parties had negotiated the exchange of the A/C Plastics equipment for the purchase orders. (*Id.* ¶ 88.) It further alleges that, to this date, Dometic has failed to acknowledge its responsibilities with respect to the agreed-to exchange of production equipment for purchase orders. (*Id.* ¶ 92.)

The Court finds that the allegations relating to this second misrepresentation are likewise made with sufficient particularity to satisfy Rule 9(b), as they set forth alleged communications in detail, as well as the date, and why they were fraudulent. TIMS further alleges that it relied on these misrepresentations to its detriment. (*See id.* ¶ 117 (explaining that by shipping the equipment as it was told, "TIMS has been harmed because it lost the value of the production equipment[,]" as well as other costs).) While the TPC does not identify the corporate employee who made the statements, particularity under Rule 9(b) does not require that level of exactitude. *See Alsbrook*, 469 F. Supp. 3d at 843–44 (quoting *Newberry*, 806 F. App'x at 362).

Accordingly, the Court finds that TIMS has given sufficient notice of its fraudulent misrepresentation claim, in compliance with Rules 8(a) and 9(b), and dismissal of this claim is not warranted at this time.

### 4. *Cause of Action E: Negligent Misrepresentation*

TIMS also alleges that Dometic engaged in negligent misrepresentation. (Doc. No. 24 ¶¶ 118–21.) To state a claim for negligent misrepresentation, a plaintiff must allege: (1) the defendant, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest; (2) supplies false information; (3) for the guidance of others in their business transactions; (4) where those others experience pecuniary loss caused by justifiable reliance on that information; (5) and he fails to exercise reasonable care or competence in obtaining or communicating the information. *Abboud v. Liberty Mut. Ins. Grp., Inc.*, 711 F. App'x 773, 777 (6th Cir. 2017) (quoting *Delman v. City of Cleveland Heights*, 534 N.E.2d 835, 838 (Ohio 1989)).

Dometic argues that this claim should be dismissed because the parties did not have a "special relationship" under Ohio law. (Doc. No. 35, at 7.)[6] While not an element of the tort of negligent misrepresentation, "the Ohio Supreme Court interprets the requirement that a defendant supplied information for a plaintiff's 'guidance in their business transactions' to mean that the plaintiff must be a member of a limited class of people who foreseeably rely on the defendant's representations." *Benedetti Cabinets, L.P. v. Sherwin-Williams Co*., No. 1:22-cv-737, 2023 WL 6278813, at *11 (N.D. Ohio Sept. 27, 2023) (citing *Haddon View Inv. Co. v. Coopers & Lybrand*, 436 N.E.2d 212, 214–15 (Ohio 1982)). "Usually the defendant is a professional (e.g., an accountant) who is in the business of rendering opinions to others for their use in guiding their business, and the plaintiff is a member of a *limited* class." *Picker Int'l, Inc. v. Mayo Found*., 6 F. Supp. 2d 685, 689 (N.D. Ohio 1998); *see Ziegler v. Findlay Indus., Inc*., 464 F. Supp. 2d 733, 738 (N.D. Ohio 2006) (providing a non-exhaustive list of special relationships, which includes attorneys, surveyors, abstractors of title, banks dealing with non-depositors' checks, and investment advisors) (quotation marks and citations omitted).

TIMS argues that Dometic was, in fact, "suppl[ying] … information for the guidance of [TIMS] in their business transactions," because "Dometic *controlled* TIMS through its demands and expectations." (Doc. No. 42, at 15 (quoting *Martin v. Ohio State Univ. Found.*, 742 N.E.2d 1198, 1209 (Ohio Ct. App. 2000)).) It explains that "TIMS was in no position to challenge Dometic when Dometic held power over TIMS as TIMS's only customer in a supply chain created solely

---

[6] Dometic repeatedly uses the term "fraudulent misrepresentation" under its heading for "negligent misrepresentation." (*See* Doc. No. 35, at 7.) This phrasing is important because fraudulent misrepresentation and negligent misrepresentation are distinct claims with distinct requirements. The Court infers that Dometic's use of "fraudulent misrepresentation" within this section was accidental and that Dometic meant "negligent representation" when it referred to "fraudulent representation" in this section.

by Dometic and existing solely for the purpose of benefitting Dometic." (*Id.*)

Dometic contends that TIMS's negligent representation claim should be dismissed because what TIMS has described is a "typical manufacturing/purchase arrangement." (Doc. No. 35, at 7.) It argues that a "special relationship" simply cannot "exist in ordinary business transactions."  (*See id.* (quoting *Ziegler*, 464 F. Supp. 2d at 738–39).) As the court in *Benedettini Cabinets* observed, however, courts interpreting Ohio law are divided as to whether such a relationship can be found in an arm's-length business transaction. *See Benedettini Cabinets*, 2023 WL 6278813, at *12 (collecting Ohio district court cases for and against finding the possibility that such a relationship may exist in business transactions).

The Court finds that it need not weigh in on the split within the Sixth Circuit because, even if there are situations where a "special relationship" can develop between parties in an arm's-length business transaction, the facts as alleged in the TPC do not support a finding that such a relationship existed between these parties. Dometic is not alleged to be in the business of providing advice or guidance to others such that it would owe any type of special duty to TIMS beyond the "generalized business obligation of good faith and fair dealing" inherent in all business transactions. *See Ore Capital Advisers, LLC v. Borror Constr. Co., LLC*, No. 2:19-cv-5087, 2021 WL 2457989, at *7–8 (S.D. Ohio June 16, 2021) (dismissing negligent misrepresentation claim by finding that the relationship between defendant contractor and plaintiff property owner was "purely a business relationship built on trust").

Additionally, TIMS has not alleged that Dometic provided it with advice designed to guide its business decisions. Rather, the TPC states that Dometic dictated its product demands to TIMS, who, in turn, attempted to meet those demands in the course of their business relationship. *See, e.g.*, *Salata Holding Co., LLC v. Chepri, LLC*, No. 2:20-cv-4529, 2021 WL 1964614, at *11 (S.D.

Ohio May 17, 2021) (dismissing negligent misrepresentation claim where the defendant company's "inflated" representation regarding its experience developing online ordering systems did not create a special duty owed to plaintiff). To find otherwise would turn the special relationship requirement on its head, inserting a "special relationship" into every arm's-length business transaction in Ohio. *See Benedettini Cabinets*, 2023 WL 6278813, at *12 (refusing to "read Ohio law to impose a duty in tort on every party to an arm's-length commercial transaction who communicates with its counterpart about a product or service at issue"). Thus, TIMS's negligent misrepresentation claim (*i.e.*, Cause of Action E) is dismissed.

### 5. *Cause of Action F: Tortious Interference with Business Relations*

In its tortious interference with business relations claim, TIMS asserts that Dometic intentionally caused TIMS to breach its contracts with Dometic's Directed Suppliers. (Doc. No. 24 ¶ 124.) It alleges that it was not able to pay the Directed Suppliers after Dometic refused to accept the component parts, and, thus, it had to breach contracts and end business relationships with the Directed Suppliers. (*Id.*) TIMS claims that it is entitled to damages as a result of Dometic's actions, including "alleged costs in claims for breach asserted by Dometic's Directed Suppliers" and "harm to TIMS's business relationships with those Directed Suppliers." (*Id.* ¶ 125.)

Under Ohio law, "[t]he tort of interference with a business relationship occurs when a person, without a privilege to do so, induces or otherwise purposely causes a third person not to enter into or continue a business relationship with another." *Harris v. Bornhorst*, 513 F.3d 503, 523 (6th Cir. 2008) (quoting *McConnell v. Hunt Sports Enters.*, 725 N.E.2d 1193, 1216 (Ohio Ct. App. 1999) (alternation in original)). Dometic argues that this claim should be dismissed because "it would be the party whose contract [TIMS] breached that would have standing to bring a tortious interference claim for breach of its contract, not [TIMS], the self-alleged breacher." (Doc. No. 35,

at 8.) TIMS contends that the case law does not prevent it from bringing a tortious interference claim; such a claim merely "require[s] an intentional interference causing a breach or termination of the relationship." (Doc. No. 42, at 17 (quoting *Kelley v. Buckley*, 950 N.E.2d 997, 1013 (Ohio Ct. App. 2011)).)

As Dometic notes (*see* Doc. No. 46, at 15), the case TIMS cites actually supports Dometic's understanding of the requirements for a tortious interference claim. The court in *Kelley v. Buckley* explained that "[t]he basic principle for an action based upon tortious interference is that 'one, who is without privilege [and] induces or purposely causes a third party to discontinue a business relationship with another is liable to the other for the harm caused thereby.'" 950 N.E.2d at 1013 (quoting *Wolf v. McCullough–Hyde Mem. Hosp., Inc.*, 586 N.E.2d 1204, 1209 (Ohio Ct. App. 1990) (alteration in original)); *see also McConnell v. Hunt Sports Ent.*, 725 N.E.2d 1193, 1216 (Ohio Ct. App. 1999) (providing the same principle); *A & B–Abell Elevator Co. v. Columbus/Cent. Ohio Bldg. & Constr. Trades Council*, 651 N.E.2d 1283, 1294 (Ohio 1995) (same).

In this case, in order for TIMS to have a viable claim for tortious interference, Dometic would have had to "induce[] or purposely cause[] a third party," meaning Dometic's  Directed Suppliers, "to discontinue a business relationship with another[,]" meaning TIMS. *See Wolf*, 586 N.E.2d 1204, 1209. Dometic would then be "liable to the other[,]" TIMS, "for the harm caused thereby." *See id.* But because Dometic allegedly caused TIMS, not the Directed Suppliers, to

terminate the business relationship, TIMS cannot prevail on this claim. The tortious interference

claim (*i.e.*, Cause of Action F) is dismissed.[7]

### III.    MOTION FOR JOINDER

#### A.  Standard of Review

Fed. R. Civ. P. 19(a) provides for the compulsory joinder of a nonparty in three circumstances: (1) when the absence of the nonparty precludes complete relief among the parties already present; (2) when the nonparty will be unable to protect an interest he has in the litigation; or (3) when the nonparty's interest in, but absence from, the litigation subjects parties already in the action to a substantial risk of multiple obligations. Rule 19(a) also provides that a required party should be joined if the party is "subject to service of process and whose joinder will not deprive the court of subject-matter jurisdiction." The Sixth Circuit employs a three-part test to determine whether a party must be joined under Rule 19(a). "First, the court must determine whether the person or entity is a necessary party under Rule 19(a)." *Glancy v. Taubman Ctrs., Inc.*, 373 F.3d 656, 666 (6th Cir. 2004). "Second, if the person or entity is a necessary party, the court must then decide if joinder of that person or entity will deprive the court of subject matter jurisdiction." *Id.* "Third, if joinder is not feasible because it will eliminate the court's ability to hear the case, the court must analyze the Rule 19(b) factors to determine whether the court should in equity and good conscience dismiss the case because the absentee is indispensable." *Id.* (citation and internal quotation marks omitted). The burden is on the moving party to establish that a party is necessary for purposes of Rule 19(a). *Eagle Realty Invs., Inc. v. Dumon*, No. 18-cv-362, 2019 WL 608830, at *2 (S.D. Ohio Feb. 13, 2019).

---

[7] Dometic also makes a cursory argument that this claim should be dismissed because TIMS failed to allege that Dometic's conduct was "not justified." (Doc. No. 35, at 8.) For the reasons given, TIMS's tortious interference claim must be dismissed regardless of the merits of this argument.

Fed. R. Civ. P. 12(b)(7) permits a party to move to dismiss a claim for "failure to join a party under Rule 19." Rule 19(b) sets out four factors courts should consider in determining whether a required party should be deemed an indispensable party such that the case should be dismissed: (1) "the extent to which a judgment rendered in the person's absence might prejudice that person or the existing parties;" (2) "the extent to which any prejudice could be lessened or avoided . . . ;" (3) "whether a judgment rendered in the person's absence would be adequate;" and (4) "whether the plaintiff would have an adequate remedy if the action were dismissed for nonjoinder."

### B.  Discussion

Dometic argues that the Court must require joinder of TIMS-Mexico or dismiss the TPC for failure to join an indispensable party. (*See* Doc. No. 36, at 1.) In support of compulsory joinder, Dometic offers three grounds: (i) TIMS-Mexico is a party to the contract that resulted in the breach of contract claim against Dometic (*see id.* at 6); (ii) Dometic risks double liability if TIMS-Mexico is not joined (*see id.* at 7); and (iii) TIMS-Mexico played a key role in the events that led to the filing of this action and possesses key discovery. (*See id.* at 8.) TIMS disputes each of these grounds. (*See* Doc. No. 43, at 10–12.)

The first basis Dometic advances for compulsory joinder is that the TPC "plainly and repeatedly" states that TIMS-Mexico is a party to the contract set forth in the contract claim (Cause of Action A).[8] (Doc. No. 36, at 6.) The Court agrees with TIMS that the TPC is devoid of any allegations that, if believed, would support a finding that TIMS-Mexico had a contractual

---

[8] Of course, Dometic's argument that there was clearly a contract between Dometic and TIMS-Mexico appears rather disingenuous given that Dometic asserts in its motion to dismiss that the purchase orders it issued solely to TIMS (and not to TIMS-Mexico) form the only contract at issue in the TPC. (*See* Doc. No. 35, at 4.)

relationship with Dometic. (*See* Doc. No. 43, at 10–11; Doc. No. 24 ¶ 6.) As previously discussed, the TPC alleges that "TIMS entered into a business relationship with Dometic" in July 2019. (Doc. No. 24 ¶ 6.) While Dometic points to language in paragraph 6 of the TPC averring that the communications between and conduct of Dometic, TIMS, and TIMS-Mexico established the "metes and bounds" of the "contractual relationship," the "contractual relationship" at issue was the one that TIMS "entered into" "with Dometic" in July 2019. (*Id.* (quoting Doc. No. 24 ¶ 6).) The Court finds that the first basis for joinder does not apply to the present case.

As its second basis for joinder, Dometic contends that it faces a risk of "double liability" if TIMS-Mexico is not joined. (*See* Doc. No. 36, at 7–8.) According to Dometic, both TIMS and TIMS-Mexico could make claims for the costs associated with laying off staff at the Juarez facility. (*See id.* at 8.) TIMS disagrees, arguing that "TIMS-Mexico is TIMS's subsidiary operating the Juarez facility as a subcontractor to TIMS." (Doc. No. 43, at 12.) According to TIMS, any alleged costs incurred by TIMS-Mexico "in the form of severance payments and inventory space at Juarez . . . were passed on [to] TIMS as the original contractor—as in any other contractor-subcontractor arrangement." (*Id.*) "As a result," TIMS argues, "there is only TIMS left holding the bag for layoffs and inventory space." (*Id.*)

Relevant to this second basis, Rule 19(a) provides, in part, that joinder of an absent party is required if that party:

> claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may . . . leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest.

Fed. R. Civ. P. 19(a)(1)(B)(ii). "Rule 19 does not speak of inconsistent 'results.' Rather, it speaks in terms of inconsistent 'obligations.'" *Williams-Sonoma Direct, Inc. v. Arhaus, LLC*, 304 F.R.D.

520, 533 (W.D. Tenn. 2015) (quoting *Bedel v. Thomason*, 103 F.R.D. 78, 81 (S.D. Ohio 1984)). "Consequently, whether a party faces the possibility of multiple actions—and potentially even logically inconsistent judgments—is irrelevant if the party is not at risk of inconsistent obligations." *Id.* (citations omitted).

Here, the Court finds that Dometic is not at risk of incurring inconsistent obligations. The subcontractor agreement between TIMS and its subsidiary, TIMS-Mexico, makes clear that TIMS guarantees TIMS-Mexico that it will pay for costs of "labor, rent, utilities, purchased materials," and all other manufacturing "costs and expenses incurred by [TIMS-Mexico]" for TIMS's products. (Doc. No. 43-1 (Contract), at 5, Eighth Clause.) Under the terms of this subcontractor agreement, TIMS is responsible to TIMS-Mexico for the losses it allegedly sustained—labor and rent—during the manufacture of the subject toilets. The right to recover those losses from Dometic, therefore, belongs to TIMS and not TIMS-Mexico. Any rights TIMS-Mexico might have flow from its agreement with TIMS separate and apart from the contract with TIMS and Dometic. *See Warner v. Hamburg Prod., LLC*, No. 12-13290, 2013 WL 2048635, at *3–4 (E.D. Mich. May 14, 2013) (explaining that plaintiff's ex-wife was not a necessary party to a breach of contract claim involving plaintiff's copyrighted works, even though she would be entitled to a portion of any money plaintiff recovered in the lawsuit, where the ex-wife had "no interest in [plaintiff's] copyrighted works and is not a party to [p]laintiff's contract with [d]efendant").

Additionally, any action that TIMS-Mexico could bring against Dometic would involve the same issue that will be litigated herein: TIMS's ability to recover its losses from Dometic. Given that this issue will be actually litigated in the present action, the Court's judgment will likely have preclusive effect in any subsequent action brought by TIMS-Mexico. *See, e.g.*, *Williams-Sonoma Direct*, 304 F.R.D. at 535 ("Because [the third-party] is likely to be precluded from

relitigating the issues before the Court, [d]efendants are not at substantial risk of inconsistent obligations.") There is no basis, therefore, to conclude that Dometic is at risk of incurring double or inconsistent obligations. Thus, this second ground does not support compulsory joinder.

As its third ground, Dometic argues that TIMS-Mexico "played an intricate and key role in the claims giving rise to this case and itself possesses key discovery." (Doc. No. 36, at 8.) It notes that TIMS-Mexico manufactured the allegedly defective toilets that are at issue in the TPC, and, as a result, was intimately involved in the events that transpired giving rise to this third-party litigation and "possesses key discovery." (*Id.*) According to Dometic, the fact that TIMS-Mexico "played a key role in the factual underpinnings of this case and possesses key discovery information[,] . . . further renders TIMS-Mexico a required party under Rule 19(a)." (*Id.* at 9.)

In support, Dometic cites to a decision from another judicial officer in this District—*The We Project, Inc. v. Relavistic, LLC*—representing that in that case, the district judge joined a third-party under similar circumstances because he found that the individual had "played a key role in the factual underpinnings of [the] case and personally possess[ed] key discovery information." No. 1:20-cv-2873, 2021 WL 1986672, at *1 (N.D. Ohio May 3, 2021). (*See* Doc. No. 36, at 9 (citing *The We Project* for this proposition).) This simply was not the holding in *The We Project*; the court held quite the opposite.

There, defendants sought to join a non-party investor of the plaintiff company in plaintiff's civil action against defendants, whom plaintiff claimed embezzled the invested funds. *The We Project*, 2021 WL 1986672, at *1. Despite finding that the complaint established that the non-party "played a key role in the factual underpinnings" and "personally possessed key discovery," the district judge *denied* the defendants' Rule 19 joinder motion, finding that the non-party investor

was not a necessary party under Rule 19(a). *Id.* at *1–3.[9] Specifically, the Court reasoned that it could afford complete relief to the existing parties without joining the non-party investor and that any judgment in the case would preclude the non-party investor from later bringing a separate action against defendants, eliminating the concern that defendants could be exposed to inconsistent obligations. *Id*. at *1–2. Additionally, the court found that any interest the non-party investor had in the case would be adequately protected by the plaintiff because they shared common interests. *Id*. As for the discovery possessed by the non-party investor and the concern over repetitive and multiple litigation, the court reasoned that "judicial economy considerations, without more, do not make a party necessary under Rule 19." *Id*. at *2 (citation omitted).

The Court finds the reasoning in *The We Project* persuasive and apposite to the present case. Here, the Court can afford complete relief to TIMS from Dometic, as the third-party plaintiff, should TIMS demonstrate an entitlement to such relief, without joining TIMS-Mexico. Any tangential interest TIMS-Mexico has in the present action will be adequately represented by TIMS, with whom it shares common interests. Additionally, for reasons already discussed, there is no risk of subjecting Dometic to inconsistent obligations because this Court's judgment would be preclusive in any subsequent action pursued by TIMS-Mexico and the only possible obligation flows from TIMS. Finally, neither the unlikely prospect of subsequent litigation by TIMS-Mexico, nor the fact that TIMS-Mexico is likely to possess discovery information, supports joinder under Rule 19(a).

Because there are no valid grounds for joining TIMS-Mexico under Rule 19(a) as a

---

[9] Dometic's counsel is hereby admonished for misstating the holding in *The We Project* case. Although this could be considered a misrepresentation to the Court, the Court is willing to treat it as a simple error. Counsel will be expected to take greater care in the future to ensure the accuracy of the legal research presented to the Court and to properly cite the cases upon which they rely.

necessary party, the motion for compulsory joinder is denied.

## IV.  CONCLUSION

For the reasons discussed above, Dometic's motion to dismiss for failure to state a claim (Doc. No. 35) is GRANTED as to Cause of Action E (Negligent Misrepresentation) and Cause of Action F (tortious interference with contract) and DENIED as to all other causes of action in the TPC. Additionally, Dometic's motion for compulsory joinder (Doc. No. 36) is DENIED.

**IT IS SO ORDERED**.

Dated: April 9, 2024

_____
**HONORABLE SARA LIOI**
**CHIEF JUDGE**
**UNITED STATES DISTRICT COURT**